2015 ND 32

**In the Matter of the Petition for Leave to Appeal of Gregory Ian RUNGE**

**Gregory Ian Runge, Petitioner**

**v.**

**Disciplinary Board of the North Dakota Supreme Court, Respondent.**

**No. 20140135.**

Supreme Court of North Dakota.

Feb. 12, 2015.

Thomas A. Dickson, Bismarck, N.D., for petitioner.

Kara J. Johnson, Disciplinary Counsel, Bismarck, N.D., for respondent.

PER CURIAM.

[¶ 1] Attorney Gregory Ian Runge appeals from a Disciplinary Board decision affirming the Inquiry Committee West determination to admonish him for violating N.D.R. Prof. Conduct 1.14 relating to representation of a client with limited capacity. The record does not clearly and convincingly establish Runge violated N.D.R. Prof. Conduct 1.14, and we dismiss the complaint.

I

[¶ 2] On September 17, 2009, Norman Franz executed a "durable unlimited power of attorney" authorizing his daughter, Rose Pfeifer, to act as his attorney-in-fact for decisions about his finances and property and explicitly precluding anyone from making medical or health care decisions for him. The power of attorney appointed another daughter, Susan Ternes, as successor attorney-in-fact if Pfeifer refused to act, and both daughters accepted their appointments. The printed power of attorney form notified Franz:

> "By signing this document, you are not giving up any powers or rights to control your finances and property yourself. In addition to your own powers and rights, you are giving another person, your attorney-in-fact, broad powers to handle your finances and property, which may include powers to encumber, sell or otherwise dispose of any real or personal property without advance notice to you or approval by you."

The form also advised, "You have the right to revoke the designation of the attorney-in-fact and the right to revoke this entire document at any time and in any manner."

[¶ 3] In September 2012, shortly after his 79th birthday, Franz suffered a heart attack, and he began living at the Missouri Slope Lutheran Care Center on October 30, 2012. On October 31, 2012, medical personnel at Missouri Slope executed an "emergency care statement" form for Franz, which was included in his records. The form had checked boxes indicating Franz was "incapable of making medical decisions" and his "code status" was "Level 2 ... No defibrillation, no chest compression, no artificial respiration ... transfer to the hospital." The emergency care statement was signed by Pfeifer on a line designating her as a "responsible party."

[¶ 4] Franz lived at Missouri Slope until April 2013, when Runge prepared a document to revoke the September 17, 2009 power of attorney. According to Runge, he received a telephone call from Franz's friend, Ida Giesinger, on March 30, 2013, stating Franz wanted to leave the nursing home and asking Runge for legal advice. Runge said he asked Giesinger several questions to determine the nature of the matter, including why Franz was in the nursing home and whether a guardianship or conservatorship for him existed. Giesinger told Runge about Franz's heart attack and that there was not a guardianship or conservatorship, but Franz had executed a power of attorney naming his daughter as his attorney-in-fact. Runge asserted he told Giesinger that because no guardianship or conservatorship existed, all Franz needed to do to leave the nursing home was revoke the power of attorney. Runge said Giesinger asked him about his fee for preparing a revocation of a power of attorney but he was not then retained as an attorney for Franz. Runge stated

that after his telephone conversation with Giesinger, he conducted an online record inquiry and discovered there was no guardianship or conservatorship for Franz, but that Pfeifer had filed a January 2013 petition on behalf of Franz, seeking a disorderly conduct restraining order against Giesinger.

[¶ 5] According to Runge, he received another telephone call from Giesinger on April 2, 2013, asking him to prepare a revocation of the power of attorney for Franz and to bring the document to the nursing home for Franz to sign. Runge stated he talked to Franz on the telephone to discuss his desire to leave the nursing home and Franz informed Runge his daughter was forcing him to stay in the nursing home and he wanted to leave. Runge drafted a revocation of the power of attorney and went to the nursing home, where he met Franz and Giesinger in Franz's room to discuss the ramifications of the revocation of the power of attorney. Runge said he told Franz he was free to leave the nursing home after he signed the revocation of the power of attorney and Franz indicated he could attend to his own medical needs. Runge stated he read the revocation of the power of attorney to Franz. Franz signed it after receiving an explanation about its effect and indicating he understood the document. Runge claimed a nursing home social worker came into Franz's room while Runge was there and was informed that Runge was Franz's attorney and Franz had signed a revocation of the power of attorney. Runge stated he left the nursing home and later that day received a telephone call from the social worker, stating Franz's daughter was refusing to allow him to leave the nursing home. Runge said he informed the social worker that Franz's daughter had no say in the matter after Franz revoked the power of attorney and Franz left the nursing home later that afternoon to live with Giesinger. Runge stated concerns about Franz's health may have existed when Franz first arrived at the nursing home, but did not exist when Franz revoked the power of attorney. Runge also said the decision to leave the nursing home was made solely by Franz.

[¶ 6] According to Franz's medical progress notes at Missouri Slope, Franz left the nursing home on April 3, 2013, after a nursing home representative, Sharon Klein, told Runge on the telephone that Franz had been determined to be incapacitated and the revocation of the power of attorney likely would not be upheld in court. The progress notes stated Franz was discharged from the nursing home to his friend's home against medical advice and Franz signed an April 3, 2013 document releasing Missouri Slope from liability for the discharge. The progress notes stated a welfare check conducted later that day revealed Franz was "OK" and "did not want to come back to the nursing home." Franz's medical records at Missouri Slope also included a reference to an "advanced directive" stating, "Code Status: Level 2– No defibrillation, no chest compression, no artificial respiration. TRANSFER TO HOSPITAL" and "DPOA for Health Care."

[¶ 7] Pfeifer filed a disciplinary complaint against Runge, alleging he acted improperly in preparing the revocation of the power of attorney for Franz without speaking with his family or the nursing home to ascertain his health condition. Pfeifer's complaint was assigned to the Inquiry Committee West for investigation, and Runge responded, denying the allegations in the complaint. Runge was notified the Inquiry Committee West would consider Pfeifer's complaint at its September 2013 meeting in Bismarck, and Runge and his lawyer appeared at that meeting. In October 2013, the Inquiry Committee West

issued a written decision determining Runge violated N.D.R. Prof. Conduct 1.14 and admonishing him:

> "*The Committee found* that Attorney Gregory I. Runge violated N.D.R. Prof. Conduct 1.14, regarding client with limited capacity, by preparing a Revocation of Power of Attorney at the request of a third person and delivering the same to a nursing home, where it was executed by a resident/client whom Mr. Runge had never met, and failing to communicate with the client's appointed representative, a family member who had been appointed in a durable power of attorney. The Committee determined that discipline in the form of an admonition is appropriate. Therefore, Attorney Gregory I. Runge is hereby issued an ADMONITION by the Inquiry Committee West."

[¶ 8] Runge requested review by the Disciplinary Board, which affirmed the decision at its January 2014 meeting. Runge then petitioned this Court to appeal the Disciplinary Board's decision, and we determined Runge had made a sufficient showing to justify granting him leave to appeal the Disciplinary Board's decision. *See Toth v. Disciplinary Bd.*, 1997 ND 75, ¶ 10, 562 N.W.2d 744.

## II

[¶ 9] This Court reviews the substantive evidence and merits of an informal disciplinary disposition de novo on the record. *Toth*, 1997 ND 75, ¶¶ 10–11, 562 N.W.2d 744. A violation of the rules of professional conduct must be established by clear and convincing evidence. *Id.* at ¶ 11.

[¶ 10] Runge argues no clear and convincing evidence establishes he violated N.D.R. Prof. Conduct 1.14 and the Disciplinary Board's decision is based on an erroneous interpretation of North Dakota

law for a lawyer representing a client with limited capacity. Runge asserts he acted appropriately by independently meeting with Franz to determine whether he was suffering from a disability and reasonably determining Franz was not incapacitated or of limited capacity when the power of attorney was revoked. Runge claims he should not be disciplined for zealously advocating on behalf of his client. Runge also argues the informal procedures of the inquiry process are structurally deficient and denied him due process because there is no record or minutes of September 2013 proceedings before the Inquiry Committee West and the investigator's report was not provided to him for review.

[¶ 11] Disciplinary Counsel responds that Runge violated N.D.R. Prof. Conduct 1.14 in representing a client with limited capacity by failing to contact Franz's appointed representative, Pfeifer, before preparing a revocation of the power of attorney. Disciplinary Counsel argues Runge had an obligation to understand the full extent of the powers conferred upon Franz's appointed representative, including that Pfeifer had "sole" authority to make medical decisions under the October 31, 2012 "emergency care statement" on file with Missouri Slope. Disciplinary Counsel also argues Runge failed to raise a due process issue in the proceedings before the Inquiry Committee West and the Disciplinary Board and the proceedings against him nevertheless complied with due process appropriate for an admonition.

[¶ 12] Rule 1.14, N.D.R. Prof. Conduct, outlines a lawyer's ethical responsibilities in representing a client with limited capacity and provides:

> "(a) When a client's capacity to make adequately considered decisions in connection with a representation is limited,

whether because of minority, mental impairment, or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

"(b) When the lawyer reasonably believes that the client has limited capacity, is at risk of substantial physical, financial, or other harm unless action is taken, and the client cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator, or guardian.

"(c) Information relating to the representation of a client with limited capacity is protected by Rule 1.6. When taking protective action pursuant to paragraph (b), the lawyer is impliedly authorized under Rule 1.6(a) to reveal information about the client, but only to the extent reasonably necessary to protect the client's interests."

[¶ 13] Under N.D.R. Prof. Conduct 1.14(a), a lawyer's overriding directive in representing a client with limited capacity is to "as far as reasonably possible, maintain a normal client-lawyer relationship with the client." Comment 1 to the rule explains that a "normal client-lawyer relationship exists in those situations where the client, when properly advised and assisted, is capable of making or communicating responsible decisions concerning the client's person or affairs." Comments 2 and 3 to the rule explain, "[t]he law nevertheless recognizes ... a person with limited capacity may be able to independently make some, but not all, of the decisions necessary for that person's own care and well-being" and a client's limited capacity "does not diminish the lawyer's obligation to treat the client with attention and respect" to the extent that "[e]ven if the person has an appointed representative, the lawyer should as far as possible accord the represented person the status of client." In discussions with family members serving as representatives of a client with limited capacity, "[t]he lawyer must keep the client's interest foremost and, except for protective action authorized under [N.D.R. Prof. Conduct 1.14](b), must look to the client, and not the representatives, to make decisions on the client's behalf." *Id.* at cmt. 4. If a client has an appointed representative, "the lawyer should ordinarily look to the representative for decisions on behalf of the client," but "[t]he lawyer should be cognizant of the extent of the powers and duties conferred upon the client's appointed representative." *Id.* at cmt. 5. In determining the extent of a client's capacity, a "lawyer should consider and balance such factors as: the client's ability to articulate the reason leading to a decision; variability of state of mind and ability to appreciate consequences of a decision; the substantive fairness of a decision; and the consistency of a decision with the known long-term commitments and values of the client." *Id.* at cmt. 6.

[¶ 14] Analysis of Runge's ethical obligations under N.D.R. Prof. Conduct 1.14 requires assessment of the record regarding Franz's capacity in April 2013. Runge claims Franz was free to make his own medical decisions in April 2013 and was not a client with limited capacity. Disciplinary Counsel counters that Franz was a client with limited capacity with an appointed representative with "sole" authority to make medical decisions for him and that Runge had an ethical obligation to consult with Franz's appointed representative, Pfeifer, before Franz revoked the power of attorney.

[¶ 15] This Court recognizes "the North Dakota Rules of Professional Conduct are based in part on the ABA's Model Rules of Professional Conduct," and in interpreting our rules, we may consider other authorities' interpretation and analysis of the Model Rules. *In re Disciplinary Action Against Hann*, 2012 ND 160, ¶ 20, 819 N.W.2d 498. Under the language of Model Rule 1.14(a), which is nearly identical to N.D.R. Prof. Conduct 1.14(a), one recognized authority has said that the principle requiring a lawyer-client relationship that is "as normal as is reasonably possible" commits the fine judgments that must be made about capacity to the professional discretion of the lawyer on the scene. 1 Geoffrey C. Hazard, Jr., W. William Hodes, & Peter R. Jarus, *The Law of Lawyering* § 19.04 (4th ed.2015). That source recognizes the chief mission of Model Rule 1.14(a) is to ensure lawyers adequately evaluate the difficult problems associated with representation of clients with limited or diminished capacity and states a lawyer cannot be disciplined for action that was the product of reasonable deliberation, has a plausible professional basis, and arguably serves the client's best interests. *The Law of Lawyering,* at § 19.04. Under that authority, a lawyer representing a client with questionable capacity generally is given a range of professional judgment to ascertain capacity.

[¶ 16] Here, Runge was retained for the purpose of helping Franz execute necessary documents to leave Missouri Slope. According to Runge, he ascertained no conservatorship or guardianship was in place for Franz, but found a power of attorney designating Pfeifer as Franz's attorney-in-fact existed. Runge indicated he talked to Franz on the telephone on April 2, 2013, and Franz expressed his desire to leave the nursing home. Runge stated he drafted the revocation of the power of attorney for Franz and took the document to the nursing home on April 2, 2013, where he personally met with Franz and discussed the ramifications of the revocation. According to Runge, Franz signed the revocation after indicating he understood the document. Runge stated concerns about Franz's health may have existed when Franz first arrived at the nursing home in October 2012, but those concerns did not exist in April 2013, and the decision to leave the nursing home was Franz's decision. The evidence indicates Runge was adequately and reasonably able to evaluate Franz's capacity from the telephone conversation and in the personal meeting with Franz at Missouri Slope on April 2, 2013. Runge's assessment of Franz's capacity was within the range of a lawyer's exercise of professional judgment.

[¶ 17] Disciplinary Counsel's reliance on *In re Disciplinary Action Against Kuhn*, 2010 ND 127, 785 N.W.2d 195, and Missouri Slope's "emergency care statement" in conjunction with the power of attorney is misplaced. The "emergency care statement" indicates that on October 31, 2012, Franz was "incapable of making medical decisions," that his "code status" was "Level 2 ... No defibrillation, no chest compression, no artificial respiration ... transfer to the hospital," and that Pfeifer signed the document as a "responsible party." Whatever internal significance the October 2012 "emergency care statement" may have for Missouri Slope, the plain language of that document does not comply with the statutory requirements for a health care directive in N.D.C.C. ch. 23–06.5 and is ineffective as a medical power of attorney. *See* N.D.C.C. § 23–06.5–05 (outlining healthcare directive requirements). Nor was the care statement anything approximating a guardianship. *See* N.D.C.C. ch. 30.1–28. Contrary to Disciplinary Counsel's assertion, Pfeifer's signature on the emergency

care statement as a "responsible party" did not give her "sole" authority in April 2013 to make medical decisions for Franz. Franz's power of attorney only authorized Pfeifer to handle his finances and property and explicitly did not authorize her to make medical or other health care decisions for him.

[¶ 18]   In *Kuhn*, 2010 ND 127, ¶ 20, 785 N.W.2d 195, this Court considered a formal disciplinary proceeding against an attorney representing an elderly person with a court-appointed guardianship and conservatorship.   In that case, the attorney drafted a will for the ward without communicating with the ward's court-appointed guardian and this Court concluded the attorney violated N.D.R. Prof. Conduct 1.14 and comment 5 by not communicating with the guardian when drafting the will for the ward. *Kuhn*, at ¶ 20. *Kuhn* is not controlling because a guardianship or conservatorship contemplates a legal proceeding in which the ward has had his or her authority withdrawn by a court order. *See* N.D.C.C. §§ 30.1–28–03 (procedure for court appointment of guardian for incapacitated person) and 30.1–29–01 (proceedings for protection of property of persons under disability). In contrast, a power of attorney involves a principal granting an agent authority to act for the principal and retaining authority to act for themself, which necessarily includes the authority to revoke the agent's authorization. *See In re Estate of Littlejohn*, 2005 ND 113, ¶ 7, 698 N.W.2d 923 (stating "power of attorney is an instrument in writing authorizing another to act as one's agent").

[¶ 19]   Here no guardianship or conservatorship existed that withdrew Franz's authority to act for himself.   Rather, Franz shared his authority to act and he remained free to withdraw the authority conferred under that power of attorney, which, in any event, precluded anyone

from making his medical decisions.   This record reflects Runge talked with Franz by telephone and in person to ascertain his wishes before Franz revoked the power of attorney.   Runge's recitation of his conversations with Franz does not clearly and convincingly establish Franz was incapacitated in April 2013.   This record does not reflect any subsequent attempt to obtain a court-ordered guardianship or conservatorship for Franz, which belies any suggestion that he was incapacitated in April 2013.   Nothing indicates Runge did not understand the limited powers conferred upon Pfeifer by the power of attorney and by the emergency care statement when Franz executed the revocation of the power of attorney on April 2, 2013.   This Court recognized the rules of professional conduct set a minimum level of conduct for discipline. *See In re Disciplinary Action Against McKechnie*, 2003 ND 22, ¶ 16, 656 N.W.2d 661.   Runge's communications with Franz demonstrated Franz's ability to articulate the reasons for his desire to leave the nursing home and to appreciate the consequences of his decision. *See* N.D.R. Prof. Conduct 1.14 cmt. 6 (outlining factors for assessing capacity).   Although Runge could have contacted Pfeifer before Franz executed the revocation of the power of attorney, N.D.R. Prof. Conduct 1.14 did not require him to contact her after ascertaining Franz's capacity.   We conclude clear and convincing evidence does not establish Runge violated N.D.R. Prof. Conduct 1.14.   The complaint against Runge is dismissed.

## III

[¶ 20]   Because we conclude the evidence does not clearly and convincingly establish Runge violated N.D.R. Prof. Conduct 1.14, we do not address Runge's due process arguments.

## IV

[¶ 21] We dismiss the complaint against Runge.

[¶ 22] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, LISA FAIR McEVERS, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.